IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CNSP, INC. d/b/a NMSURF,

      Plaintiff,

v.                                                                          Case No. 17-CV-00355 KG/SCY

ALAN WEBBER,
RENEE VILLAREAL, SIGNE I. LINDELL,
CAROL ROMERO-WIRTH,
CHRIS RIVERA, MICHAEL GARCIA,
LEE GARCIA, JAMIE CASSUT,
AMANDA CHAVEZ,[1]
in their official capacities as mayor
and city councilors of the City of Santa Fe,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

      This matter is before the Court on competing motions for summary judgment.  In this case, Plaintiff CNSP, a local internet provider, challenges certain Santa Fe, New Mexico, city ordinances regulating broadband internet infrastructure in the public right-of-way.  *See* Amended Complaint (Doc. 71).  CNSP filed two Motions for Summary Judgment, one for each count alleged in its complaint.  (Docs. 129 & 130).  Defendants, the mayor and city counselors of Santa Fe (collectively, "Santa Fe"), responded to both Motions together and CNSP replied.  (Docs. 132 & 134).  Santa Fe, in turn, filed its own Motion for Summary Judgment covering both counts. (Doc. 130).  That Motion is also fully briefed.  (Docs. 133 and 135).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jamie Cassut, Amanda Chavez, Lee Garcia, and Michael Garcia are automatically substituted for Roman Abeyta, Michael Harris, Peter Ives, and Joanne Vigil Coppler as Defendants in this matter.

Having considered the briefing and the relevant law, the Court denies CNSP's Motions and grants Santa Fe summary judgment on both counts.

I.      *Background*

        A. *Procedural Background*

        In this action, CNSP's first count alleges that the City of Santa Fe's telecommunications ordinance requires too much compensation for use of the public right-of-way—two percent of all gross charges—in violation of Section 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253, and thus the local ordinance is preempted by federal statute. *See generally* Amended Complaint (Doc. 71); Motion for Summary Judgment For Cause of Action 1 (Doc. 129). In its second count, CNSP alleges that Santa Fe's contract with another internet provider, Cyber Mesa, also violates § 253 and is also subject to preemption because it gives Cyber Mesa an unfair competitive advantage. (Doc. 71); Motion for Summary Judgment on Count 2 (Doc. 131). CNSP seeks declaratory and injunctive relief.[2]  (Doc. 71) at 9.

        CNSP originally filed this action in March 2017, challenging not only portions of the ordinance but also alleging Santa Fe had illegally refused to act on CNSP's application to construct wireline in the public right-of-way. (Doc. 1). CNSP requested both injunctive relief and damages, the latter under 42 U.S.C. § 1983. *Id.*  This Court dismissed that Complaint for failure to state a claim on which relief could be granted. (Doc. 55). On appeal, the Tenth Circuit affirmed the dismissal of the damages claims but reversed the dismissal of the equitable

---

[2] The Court previously found it had subject matter jurisdiction in its Memorandum Opinion and Order denying Defendants' Motion to Dismiss. (Doc. 94). The parties have since stipulated that jurisdiction is proper. (Doc. 97) at 2. The Court here reiterates its previous conclusion that it has jurisdiction to hear this equitable preemption claim for prospective relief under *Ex Parte Young*, 209 U.S. 123 (1908).

preemption claim. (Doc. 61); *CNSP, Inc. v. City of Santa Fe*, 755 Fed. Appx. 845 (10th Cir. 2019).

In the meantime, in 2018, CNSP received a franchise from the City of Santa Fe for use of the right-of-way. (Doc. 129) at ¶ 4 (referencing CNSP Franchise Ordinance 2018-13 (May 9, 2018)). CNSP subsequently filed its First Amended Complaint, which narrowed the issues to the two now before the Court: preemption of the 2 percent fee and the Cyber Mesa contract. (Doc. 71). On those two issues, the Court is presented cross-motions for summary judgment which it now considers.

B. *The Motions for Summary Judgment*

On its first claim, CNSP asserts that the 2 percent fee Santa Fe charges CNSP for use of the public right of way is prohibitive. CNSP argues, first, that the fee is revenue-based and disconnected from any costs borne by the city. (Doc. 129) at 1. It argues, second, that the fee is applied too broadly—that is, it is activated with any use of the right-of-way and applies to all charges from a given provider regardless of whether service to each customer requires use of the right-of-way. *Id.* at 2.

In its second Motion, CNSP urges that Santa Fe's 2014 service contract with Cyber Mesa must be preempted because Cyber Mesa received unfair preferential treatment in myriad ways— for example, geographic proximity to fiber line and a temporal head start on building a fiber network. *Generally* (Doc. 130).

For its part, Santa Fe argues that it is entitled to summary judgment because CNSP has not showed the fee prohibits its provision of service in any way. (Doc. 130) at 8–13. It next argues that the Cyber Mesa contract is expired and, regardless, not covered by § 253(a). (Doc. 130) at 14–17.

C. *Summary Judgment Standard*

Summary judgment is appropriate when the movant establishes that there is no genuine

dispute of material fact and that the movant is entitled to judgment as a matter of law. *Sawyers*

*v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020); Fed. R. Civ. P. 56(a). A fact is considered

material if it "might affect the outcome of the suit under the governing law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). An issue is "genuine" if the evidence is such

that it might lead a reasonable jury to return a verdict for the nonmoving party. *Id.*

The parties must support factual allegations with evidence and the Court is free to

consider materials such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A).

The Court resolves all reasonable inferences and doubts in favor of the nonmovant and construes

all evidence in the light most favorable to the nonmoving party. *See Hunt v. Cromartie*, 526 U.S.

541, 551–52 (1999).

The ultimate standard of proof is relevant for purposes of ruling on summary judgment.

*Anderson*, 477 U.S. at 254. "When the *moving* party has the burden of proof at trial, that party

must show *affirmatively* the absence of a genuine issue of material fact: it must support its

motion with credible evidence that would entitle it to a directed verdict if not controverted at

trial." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Rich v. Sec'y, Fla. Dep't*

*of Corr.,* 716 F.3d 525, 530 (11th Cir.2013)) (emphasis in original). "In other words, the

evidence in the movant's favor must be so powerful that no reasonable jury would be free to

disbelieve it." *Id.* at 1154.

On the other hand, if the movant does not bear the burden of proof at trial, "summary

judgment may be warranted if the movant points out a lack of evidence to support an essential

element of that claim and the nonmovant cannot identify specific facts that would create a

genuine issue." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013).

"At the summary judgment stage, non-movants ... are given wide berth to prove a factual

controversy exists." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir.

2005) (citation and quotation marks omitted).

Where, as here, the Court addresses cross-motions for summary judgment, it "must view

each motion separately, in the light most favorable to the non-moving party, and draw all

reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839

F.3d 888, 906–07 (10th Cir. 2016).  "Cross motions for summary judgment are to be treated

separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v.

Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

D. *Facts Not in Dispute*

In 2016 and 2017, Santa Fe's City Council passed updates to its Telecommunication

Facilities in the Public Rights-of-Way Ordinance, though one such ordinance has existed in some

form or another since at least 1998.  (Doc. 129) at ¶¶ 1, 5; City of Santa Fe, N.M., Code of

Ordinances § 27-2.1 *et seq.* (2022) (hereafter "Santa Fe Code").  Under the 2017 Ordinance,

telecommunications companies using public rights-of-way[3] to provide services must apply for a

franchise and then are subject to a 2 percent fee on all "gross charges."  Santa Fe Code §§ 27-2.4,

2.5 (2022).   Gross charges are "the amount paid to a telecommunications retailer for the act or

privilege of originating or receiving telecommunications in the city, and for all services rendered

---

[3] Under the City's telecommunications ordinances, the term "'Public right-of-way' has the meaning of Section 3-1-2(M) NMSA 1978," City of Santa Fe, N.M., Code of Ordinances, § 27-2.3 (2022) (italics omitted), which references "any thoroughfare that can accommodate pedestrian or vehicular traffic, is open to the public and is under the control of the municipality," NMSA 1978 § 3-1-2(M).

in connection therewith…" and subject to several exclusions not applicable here.  Santa Fe Code § 27-2.3 (2022).

CNSP, d/b/a NMSURF, is a state-regulated competitive exchange carrier, as defined in NMAC 17.11.19.7(D).  (Doc. 129) at ¶ 26.  In 2018, CNSP received a telecommunications franchise with the City of Santa Fe which granted it use of the public right-of-way.  (Doc. 129) at ¶ 4; CNSP Franchise Ordinance 2018-13 (May 9, 2018), available at (Doc. 129) Ex. 3.  That franchise agreement, in accordance with the City's Telecommunications Ordinance, incorporates the 2 percent fee on gross charges.  (Doc. 129) at ¶ 29; CNSP Franchise Ordinance 2018-13 at § 2(C).

CNSP provides various telecommunications services in Santa Fe and around New Mexico.  (Doc. 129) at ¶ 27.  Among those services is wired internet, or fiber internet, which requires running fiber cable on poles or underground.  *Id.*  The fiber cable utilized by CNSP in Santa Fe currently is placed both in public rights-of-way and in private utility easement areas (*e.g.*, alley ways) or on private property.  *Id.*  The existence of any fiber cable in the public right-of-way subjects CNSP to the 2 percent fee on all gross charges to customers in Santa Fe receiving fiber internet services from CNSP.  (Doc. 129) at ¶ 30.  CNPS's other services— wireless internet and VoIP phone service—are not subject to the 2 percent fee, according to its franchise.  (Doc. 129) at ¶ 27.

Beginning in late 2019, CNSP has had a single wired internet customer in Santa Fe. (Doc. 129) at ¶¶ 10, 33.  CNSP charges that customer $49.99 per month.  (Doc. 129) at ¶ 33. Based on this charge, CNSP owes Santa Fe about $12.00 per year in fees.  (Doc. 129) at ¶ 10. As of September 2021, CNSP had not paid its fee.  *Id.*  CNSP added a second fiber internet customer sometime in 2021.  *Id.*

6

Moving to the second claim, the Cyber Mesa contract, there are few undisputed facts. Cyber Mesa is a separate and distinct telecommunications company which, like CNSP, received a telecommunications franchise from Santa Fe on May 9, 2018.  Cyber Mesa Franchise Ordinance 2018-15 (May 9, 2018).[4]  The two franchises appear identical.  Prior to approval of the franchise, however, Cyber Mesa executed a service contract with the City of Santa Fe which obligated it to construct certain infrastructure for payment and allowed it access to the right-of-way and certain constructed fiber internet infrastructure.  (Doc. 130) Ex. 3; (Doc. 131) Ex. 3.  The earlier service contract is the target of CNSP's claims.  *Generally* (Doc. 131).  Whether that contract is still in effect is a critical fact in dispute.  *See* (Doc. 131) at 8 (CNSP arguing contract still operative); (Doc. 130) at 17 and (Doc. 132) at 21 (Santa Fe alleging contract is expired).

II.    *Discussion*

The Court concludes that neither Santa Fe's telecommunications ordinance nor the Cyber Mesa contract are preempted by Section 253 of the Telecommunications Act.  The purpose of the Telecommunications Act is to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 56 (1996).

A federal statute preempts a local ordinance when Congress expresses a clear intent to do so.  *Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1269 (10th Cir. 2004) ("*Qwest I*") (citing *RT Communications, Inc. v. FCC*, 201 F.3d 1264, 1269 (10th Cir.2000)).  Courts find

---

[4] The Court takes judicial notice of this franchise ordinance regardless of the disagreements between the parties.  *See Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("the court is permitted to take judicial notice of . . . facts which are a matter of public record") *abrogated on other grounds*, *McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001).

that the Telecommunications Act contains one such clear expression of congressional intent to preempt. *Id.*

Specifically, the Act preempts local ordinances which restrict the provision of telecommunications services: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Despite § 253(a)'s preemption of local ordinances regulating telecommunications services, § 253(c) preserves the municipal authority to manage public rights-of-way and to require "fair and reasonable" compensation from telecommunications companies which use the rights-of-way if it is "on a competitively neutral and nondiscriminatory basis." 47 U.S.C. § 253(c).

Given the statute, the Tenth Circuit applies a two-part test to determine if a local ordinance is preempted by the Telecommunications Act. First, "it must be determined whether the state or local provision in question is prohibitive in effect." *Qwest I*, 380 F.3d at 1269. If the provision is not prohibitive, there is no preemption. *Id.* If, however, a regulation is prohibitive, the second part of the test must be applied: "the regulation may be saved from preemption if it fits within the requirements of § 253(c)," which authorizes cities to manage the right-of-way. *Id.* Put another way, any local law that prohibits the provision of telecommunication services is preempted and will be null and void, unless it falls under the safe harbor provision.

The test is burden-shifting. A plaintiff must first show that an ordinance effectively prohibits participation in the telecommunications market under § 253(a). *New Mexico Gas Co. v. Bd. of Cnty. Commissioners of Bernalillo Cnty., New Mexico*, 423 F. Supp. 3d 1190, 1202 (D.N.M. 2019) ("*Qwest III*"). At that point, the prohibition cannot be speculative—"the plaintiff must show actual or effective prohibition rather than the mere possibility of prohibition." *Id.*

Only if that burden is carried does it then fall on the local government to prove its regulation falls

within the carve-out of § 253(c). *Id.*

    A. *Count I: The Two Percent Fee*

    CNSP argues that the 2 percent fee Santa Fe imposes on internet providers who use

wireline in the right-of-way is prohibitive, largely relying on its request that this Court adopt the

view that revenue-based fees are *per se* prohibitory. *Generally* (Doc. 129). Santa Fe asserts that

CNSP has not proven a prohibition. *Generally* (Doc. 130). The Court first addresses the proper

legal standard, then applies it to conclude that Santa Fe's Ordinance is not prohibitive.

    i.   *What Constitutes a Prohibition*

    The single issue most disputed by the parties and the question this Court must answer is

what type and amount of compensation constitutes a prohibition. The parties urge the Court to

adopt different standards. Santa Fe, citing to the Eighth Circuit, argues the correct standard is

that an ordinance is preempted only when it "formally or effectively prohibit[s] entry into the

telecommunication services market." (Doc. 130) at 11 (citing *Qwest Corp v. City of Des Moines,

Iowa*, 896 F.d 843, 845 (8th Cir. 2018); *Level 3 Comms., LLC v. City of St. Louis*, 477 F.3d 528

(8th Cir. 2007)).

    On the other hand, CNSP argues the correct standard is whether a regulation "materially

inhibits or limits the ability of a competitor to compete in a fair and balanced legal and

regulatory market," citing to the First, Second, and Tenth Circuits. (Doc. 129) at 14 (citing

*Qwest I*, 380 F.3d at 1270; *Puerto Rico Tel. Co. v. Municipality of Guayanilla*, 450 F.3d 9, 18

(1st Cir. 2006); *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002)).

    CNSP correctly cites the Tenth Circuit's binding precedent. The Tenth Circuit adopted

the "materially inhibits" standard in the controlling case in this Circuit, *Qwest I*. 380 F.3d at

1269–1271.  A "regulation need not erect an absolute barrier to entry in order to be found prohibitive."  *Id.* at 1269 (10th Cir. 2004) (citing *RT Commc'ns, Inc. v. F.C.C.*, 201 F.3d 1264, 1268 (10th Cir. 2000)).  Rather, "[i]t is enough that the Ordinance would 'materially inhibit' the provision of services."  *Id.* at 1271 (citing *In re: Cal. Payphone Ass'n*, 12 F.C.C.R. 14191, 14206 (1997)).

CNSP contends that a recent FCC Order also endorses the materially inhibits standard. (Doc. 129) at 14 (citing FCC Order 18-133 at ¶ 35).  This is true, but from there, CNSP goes further and urges this Court to adopt the FCC Order's specific rule that any fee imposed must be cost based and not revenue based (which would implicate the Santa Fe fee, which is a percentage of company revenue regardless of cost incurred by the city).  *Id.* at 18 (citing FCC Order 18-133 at ¶ 53 n. 143).  This rule would cabin a city's authority to require compensation only to the measurable cost incurred by the city in maintaining the right-of-way.  *See In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. R. 9088 (F.C.C. 2018) ("FCC Order 18-133") at ¶ 11 ("Namely, fees are only permitted to the extent that they are nondiscriminatory and represent a reasonable approximation of the locality's reasonable costs [for deploying small wireless facilities].").  It appears to this Court that such a rule would make percentage-based fees like Santa Fe's almost *per se* disallowed unless the city could show evidence the fee was connected to the costs of maintaining the right of way.  (Doc. 129) at 19 (quoting FCC Order 18-133, ¶ 70 (fn. omitted) ("… we [, the FCC,] agree with courts that have recognized that gross revenue fees generally are not based on the costs associated with an entity's use of the [right of way], and where that is the case, are preempted under Section 253(a).")).

The FCC's hardline statement against revenue-based fees faces two hurdles when applied to this case. First, Order 18-133 addresses small-scale *wireless* infrastructure (as opposed to wire-line infrastructure) and its purpose is to reduce delays and costs in introducing 5G cell phone networks to American communities. *See, e.g.*, FCC Order 18-133, ¶¶ 1–13, 32. As the FCC Order itself makes clear, the infrastructure demands of installing dense networks of small-backpack-sized wireless antennas are much different than installing cellphone towers or wired phone lines. *See id.* at ¶ 3. Reading the Order as applying only to 5G wireless networks, CNSP's current franchise agreement complies with the Order because the agreement excludes wireless cellular provision from any fee. CNSP Franchise Ordinance 2018-13 at §§ 2(B)(2) and (3); (Doc. 129) Ex. 3.

Second, the Court concludes controlling precedent in this Circuit, and not the FCC's opinion on existing caselaw, binds this Court. Primarily, the Court, despite the norm for deference to agencies found in *Chevron v. NRDC*, 467 US 837 (1984), is not persuaded that an administrative "Declaratory Ruling" expressing a preference on a split in caselaw controls the courts. *Cf.*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 137, 140 (1944) (finding Fair Labor Standards Act left question of law to court and therefore Administrator's statutory interpretation was persuasive, not binding). Moreover, the specific quote relied on by CNSP, declaring the FCC's agreement with courts which have "recognized that gross revenue fees generally are not based on" costs, cites only to caselaw outside this Circuit. *See* FCC Order 18-133, ¶ 70 n.209 (citing *Puerto Rico Tel. Co. v. Municipality Of Guayanilla*, 450 F.3d 9, 11 (1st Cir. 2006); *XO Missouri, Inc. v. City of Maryland Heights*, 256 F. Supp. 2d 987 (E.D. Mo. 2003); *Bell Atl.-Maryland, Inc. v. Prince George's Cnty., Md.*, 49 F. Supp. 2d 805 (D. Md. 1999), *vacated sub nom. Bell Atl. Maryland, Inc. v. Prince George's Cnty., Maryland*, 212 F.3d 863 (4th Cir. 2000);

*AT & T Commc'ns of Sw., Inc. v. City of Dallas*, 8 F. Supp. 2d 582 (N.D. Tex. 1998)).  The Tenth Circuit has taken a view opposite of the FCC's preference, concluding that when assessing fairness and reasonableness of fees, the Court does not measure by the city's cost, but rather uses a totality of the circumstances test.  *Qwest I*, 380 F.3d at 1272; *Qwest Corp. v. City of Santa Fe*, 10-cv-0617 RB/KBM at 39 (D.N.M. 2013) ("*Qwest II*") ("The requirements of Section 253(c) have not been interpreted to limit municipalities to cost recovery." (Internal citation omitted)). This Court remains bound by the Tenth Circuit—which has not adopted a view antagonistic to revenue-based fees for wireline infrastructure.

For these reasons, the Court finds the FCC Order's endorsement of a rule against revenue-based fees unavailing.  Thus, just as the Court rejects Santa Fe's argument for the Eighth Circuit's lenient prohibition standard, it also declines CNSP's invitation to adopt the FCC's preference for the very strict rule that revenue-based fees are nearly *per se* prohibitive. Instead, the Court applies the Tenth Circuit's binding, middle-ground, standard under which ordinances are preempted when they "materially inhibit" the provision of telecommunications services.

ii.    *Santa Fe's Two Percent Fee Does Not Materially Inhibit CNSP's Business*

Santa Fe's Telecommunications Ordinance regulating the public right-of-way does not materially inhibit the provision of broadband internet service.  A string of caselaw—often related to the City of Santa Fe—illustrates what types of ordinances courts have found "materially inhibit" the provision of services.

In *Qwest I*, the Tenth Circuit struck down certain provisions of Santa Fe's then-operative 1998 telecommunications ordinance as prohibitive, either for causing a "massive increase in costs" for Qwest or for giving the city "unfettered discretion" to block providers.  380 F.3d 1258.

First, the new ordinance tacked on several new costs, which the Court considered in the aggregate, concluding they represented a "massive" increase from the previous franchise agreement. 380 F.3d at 1270–1271. Those new costs consisted of obtaining an appraisal from a city-approved appraiser for the rental value of the right-of-way; annual rent for a twelve-by-eighteen foot concrete pad of $6000 (and Qwest's need to have 365 such pads) which would nearly quadruple Qwest's costs under the previous franchise agreement; and, a requirement to install any conduit at double capacity and dedicate the conduit to the City in fee simple, which would increase installation costs by 30 to 59 percent. *Id.* The Court construed these combined costs as "massive" and "substantial" and therefore prohibitive under the "materially inhibits" standard. *Id.* The Court was careful to note, however, that "not every increase in costs creates a prohibition within the meaning of § 253." *Id.* at 1271.

Second, the Court struck down the lease application process, finding it gave Santa Fe "unfettered discretion" to "prohibit the provision of services." *Id.* at 1270. The ordinance required submitting substantial engineering plans, allowed other vague and open-ended application requirements created at the city's discretion, and heightened requirements for approval of those leases. *Id.* "Taken together, these informational and discretionary requirements have the effect of prohibiting Qwest and other companies from providing telecommunications services." *Id.* (cleaned up) (internal quotations and citations omitted). The Court held that all vague and open-ended application requirements are prohibitive. *Id.* The Court also ruled, however, that the naked requirement of obtaining a lease with the city is not *per se* prohibitive. *Id.* at 1269. Neither is a cost-based registration fee necessarily prohibitive. *Id.*

Later, the same parties resumed litigation, this time over Santa Fe's 2010 updates to its city ordinance. *Qwest Corp. v. City of Santa Fe*, 10-cv-0617 RB/KBM (D.N.M. 2013) ("*Qwest*

13

*II*"). In *Qwest II*, the Court again struck down portions of Santa Fe's ordinance. *See Qwest II*, Findings of Fact and Conclusions of Law (Doc. 484) (Dec. 12, 2013). As CNSP describes it, the court in that case struck down a 3 percent franchise fee, which, CNSP argues, implicates the similar 2 percent franchise fee at issue in this case. That court, however, did not find the fee preempted because of its percentage, but for two other reasons. First, the court found that the 2010 Ordinance "would quadruple Qwest's total operating costs in the City." *Qwest II*, (Doc 484) at 37. The court concluded, by reference to *Qwest I*'s "massive increase" rule, that "the magnitude of the cost increase… suffices to establish the prohibitive effect here." *Id.*

The court also found the ordinance's definition of "gross revenues" subject to the fee overly broad in that it expanded the definition to wholesale revenues inclusive of long-distance calls rather than merely local services. *Id.* at 9–14 (findings of fact explaining definition of "gross revenues"). The court reasoned that Qwest would have to track whether and to what extent long-distant calls to Santa Fe actually travelled through wireline in the public right-of-way, which the court considered both "technologically impossible" and unfair because if other jurisdictions implemented similar schemes, Qwest could be double-charged for a single phone call. *Id.* at 37–38 (legal reasoning). Thus, the court concluded the expanded definition of "gross revenues" was effectively prohibitive. *Id.*

In 2019, in a substantively similar case, a different court in this District upheld Bernalillo County's right-of-way fee structure, which had been challenged by a group of plaintiffs which again included Qwest. *New Mexico Gas Co. v. Bd. of Cnty. Comm'rs of Bernalillo Cnty., New Mexico,* 423 F. Supp. 3d 1190 (D.N.M. 2019) ("*Qwest III*"). Bernalillo County's new telecommunications ordinance included several different permit application and right-of-way use fees. *Id.* at 1197–1199. Those fees were not based on a percentage of annual revenues, but the

court found that Qwest would be liable for approximately $212,783.00 per year, which the Court

deduced was equivalent to about one percent of Qwest's gross annual receipts.  *Id.* at 1205.

The court there concluded the fees did not prohibit the provision of telecommunications

services.  First, it reasoned that the "massive increase" rule from *Qwest I* and *Qwest II* did not

apply because the ordinance and fee were new and thus not technically an increase over an older

agreement.  *Id.* at 1204–1205.  The court additionally reasoned that even if that were not true, the

fees were not "massive" generally.  *Id.*  In arriving at that conclusion, the court compared

Bernalillo County's fee structure to other jurisdictions around New Mexico, finding Bernalillo

County's consistent with, if not lower than, other jurisdictions—which the court reasoned was

"not dispositive" but "not entirely irrelevant to Plaintiff's argument the new cost is 'massive'".

*Id.* at 1205.  Perhaps most relevant, Qwest urged the court to adopt the position that "the County

may only charge a fee designed to recoup costs incurred in the administrative act of granting a

franchise" and alleged that "the County has not performed a cost study to assess those costs."  *Id.*

at 1195.  The court declined to adopt that rule, and instead asserted that the "County's imposition

of this fee in itself is not considered prohibitory under § 253."  *Id.* at 1203 (citing *Qwest I*, 380

F.3d at 1269 ("[t]he mere naked requirement of a registration or lease with the city is not

prohibitive within the meaning of the statute.")).

Turning to the case before this Court, recall that a plaintiff may show an actual or

effective prohibition.  *Qwest III*, 423 F. Supp. 3d at 1202.  Plaintiff here shows neither.  The

Court first notes that CNSP offers no material facts showing that the fee actually prohibits its

business—that is, that it cuts into its profitability or ability to expand.  In fact, it has added

customers over the course of the litigation.  (Doc. 129) at 5, ¶ 10.  Not only that, CNSP

represents that it plans an expansion of service.  (Doc. 129) at 2.  Second, regarding effective

prohibition and the materially inhibits standard, the Court notes that CNSP also does not argue

that the 2 percent fee is "massive" or an "increase," let alone a massive increase. *Generally*

(Doc. 129). Rather than show actual or effective prohibition, CNSP relies almost entirely on the

imposition of a new "revenue-based-fees-are-disallowed" rule, which the Court has determined

is not controlling law in this Circuit.

Applying the "materially inhibit" standard according to this Circuit's precedent, the Court

concludes Santa Fe's 2 percent fee is neither "massive" nor an "increase." As in *Qwest III*,

CNSP is a new entrant to the market and has not had a previous franchise which has been

changed, precluding finding an increase. And militating against a finding of massiveness, such

fees as this seem to be consistent over time and geography. The 2 percent fee has a long history.

*See Qwest II*, 10-cv-0617, (Doc. 484) at 5 (finding that Qwest had a franchise with the city

requiring payment of "two-percent of revenues generated from local exchange services to

customers with service addresses in the City" since 1975). And a percentage fee is a norm across

other municipalities, at least in New Mexico. *See Qwest III* at 1197–1198 (finding that "[most]

of the municipalities in which [Qwest] provides service impose an annual franchise fee… based

on a percentage of revenues[.]"); *id.* at 1200 (finding that in 2013, Qwest paid Albuquerque a fee

of 3 percent of gross receipts); *id.* at 1200–1201 (finding Comcast paid Bernalillo County an

annual fee of 5 percent of gross revenues).[5] Additionally, at least two other companies (Cyber

Mesa and Century Link) pay Santa Fe's 2% fee for use of the right-of-way, which undermines

any conclusion that the fee is prohibitive. *See* (Doc. 130) Ex. 5 (showing Century Link paying

$165,921.75 in 2019 and Cyber Mesa paying $2,463.82 in 2020). Finally, courts outside this

---

[5] The parties to this case did not submit evidence showing how Santa Fe's 2016 ordinance
compares to other jurisdictions.

16

Circuit have upheld fees up to 5 percent of revenues.  *See, e.g.*, *City of Portland, Or. v. Elec. Lightwave, Inc.*, 452 F. Supp. 2d 1049, 1070–1075 (D. Or. 2005) (rejecting argument that city's franchise fee must be cost-based and concluding fee of 5 percent of provider's gross revenues was competitively neutral, nondiscriminatory, fair, and reasonable).

CNSP has not carried its burden of establishing the Ordinance materially inhibits its provision of telecommunications services.  It has not introduced material facts from which the Court could infer that the Ordinance effectively prohibits it from providing broadband internet service in the city.  Finding no prohibition, the Court need not determine whether Santa Fe's Ordinance fits within the safe harbor under § 253(c).  Rather, the Court determines that the Ordinance is not preempted as a matter of law, and that Santa Fe is entitled to summary judgment on Count 1.  Accordingly, the Court denies CNSP's Motion for Summary Judgment on Cause of Action 1, (Doc. 129), and grants Santa Fe's Motion for Summary Judgment, (Doc. 130), as it relates to Count 1.

B.  *Count 2: The Cyber Mesa Contract*

CNSP's second claim is that Santa Fe's 2014 Service Contract with Cyber Mesa gives Cyber Mesa an unfair competitive advantage in violation of § 253.  Section 253(a) requires local laws and agreements to be competitively neutral.  47 U.S.C. § 253(a) ("No State or local statute or regulation ... may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.").  And, as described more fully below, the FCC and federal courts have preempted local laws which advantage some providers at the expense of others.

That said, the parties to this action paint different legal pictures as to what constitutes a preemptable unfair advantage.  And the parties vigorously disagree about the facts and legal

ramifications of the 2014 Contract.  CNSP argues that Cyber Mesa's 2014 Service Contract gave

it an unfair competitive advantage over other providers because Santa Fe did not issue franchises

to other internet service providers until 2018.  (Doc. 131) at 7.  Specifically, CNSP contends

Cyber Mesa had five advantages over other providers: (1) Santa Fe paid Cyber Mesa to construct

fiber line, while other providers will have to bear their own infrastructure costs; (2) Santa Fe

gave Cyber Mesa property rights in two "buffer tubes" of fiber cable, which no other provider

enjoys; (3) the location of the fiber line was preferential for Cyber Mesa's location; (4) Cyber

Mesa had a four-year head start on other providers to develop a city-wide fiber network; and (5)

Cyber Mesa has exclusive access to a "transport line" from Albuquerque for free (and that

because of technological limitations, only one user could ever use the transport line).  (Doc. 131)

at 12–15.  CNSP makes the factual assertion that the 2014 Services Contract is still operative.

*Id.* at 8.  Finally, CNSP asks the Court to construe those benefits as conferring an improper, anti-

competitive subsidy on Cyber Mesa.  *Id.* at 12.

Santa Fe, in turn, asserts a dispositive threshold issue, arguing that CNSP does not have

standing to challenge a contract to which it is not a party.  (Doc. 132) at 17–18.  Next, on the

merits, Santa Fe urges that the Service Contract with Cyber Mesa is distinct from a franchise,

that a service contract is not covered by § 253(a), and that a city contractor cannot be deemed to

have a competitive advantage over a franchisee.  (Doc. 130) at 14–15; (Doc. 132) at 18–20.  On

that point, Santa Fe contradicts CNSP's claim that Cyber Mesa was given property rights to fiber

line; it claims that the city retains ownership of all lines under the terms of the 2014 Contract.

(Doc. 132) at 3 (citing (Doc. 130) Ex. 3 at 3, 6).  Finally, Santa Fe directly disputes CNSP's

assertion that the Contract is on-going, claiming instead that the 2014 Contract by its own terms

is no longer operative and that, therefore, no injunctive or declaratory relief is possible.  (Doc.
130) at 17; (Doc. 132) at 21.

> i.   *Disputed and Missing Material Facts Preclude Summary Judgment For CNSP*

Significant disputed facts related to the 2014 Contract preclude summary judgment in
CNSP's favor.  The parties contest whether the 2014 Contract is still operative—an important, if
not determinative, fact.  CNSP alleges that the 2014 Contract is still operative, a claim which it
supports with an email from a city employee to the president of CNSP, dated April 19, 2021,
which states the service contract has persisted on a month-to-month basis.  (Doc. 131) at 8; *id.*
Ex. 6.  Santa Fe in turn, alleges the contract is expired according to the actual terms of the
contract.  (Doc. 132) at 21 (citing (Doc. 130) Ex. 3 at 5).  Santa Fe, however, also notes that
"there are holdover provisions" which "exist to provide continuity of service while the City
evaluates other entities who may be able to provide these services to the city."  *Id.*  Slightly more
specific, "[w]hat remained was the exchange of services, in particular, operation and
maintenance of the City's fiber broadband project, for compensation."  (Doc. 130) at 16.

Because the parties attach the Contract, the Court turns to it, noting that an ambiguous
contract presents a question of fact for a jury, but that when a contract is clear as written, a court
"must give effect to the contract and enforce it as written."  *Ponder v. State Farm Mut. Auto. Ins.
Co.*, 2000-NMSC-033, ¶ 11.[6]  Here, the Contract terms are clear and unambiguous.  The
Contract is a professional services agreement.  (Doc. 131) Ex. 3 at 1 (title: "Professional Services

---

[6] This case is presented via federal question jurisdiction and therefore generally applies federal
law.  On the issue of contract interpretation, however, the Court notes that the contract stipulates
that New Mexico law shall govern it, (Doc. 130) Ex. 3 at § 17, and therefore determines it ought
to be interpreted according to New Mexico contract principles. *See Sw. Bell Tel. Co. v. Brooks
Fiber Commc'ns of Oklahoma, Inc.*, 235 F.3d 493, 499 (10th Cir. 2000) (determining, in federal
Telecommunications Act case, that telephone companies' interconnection agreement properly
interpreted according to terms of agreement and state law).

Agreement"). The Contract had a set end date. *Id.* at 5, § 5(B) ("This Agreement shall be effective on the date [] when the last of the conditions precedent listed in Section 5.A shall have been satisfied or waived in writing by both Parties, and shall terminate on the fourth (4th) anniversary of the Effective Date, unless terminated sooner pursuant to Article 6."). Santa Fe and Cyber Mesa executed the Contract in March 2014. *Id.* at 6 (showing last signature dated March 17, 2014). While there is some uncertainty as to the exact date the conditions precedent were satisfied and thus what date was exactly four years subsequent, by 2022—over eight years after execution—the Contract is almost certainly terminated.

This interpretation is supported by other provisions of the Contract. In it, Santa Fe granted to Cyber Mesa "a non-exclusive license to operate, maintain, and use" the right of way to provide telecommunications services "*for the term of this Agreement.*" *Id.* at 3, Section 2.C (emphasis added). That grant was qualified, however, by a stipulation that when the Contract ended, a regular franchise agreement would "replace" the service agreement. *Id.* at 3, Section 2.C.2. Recall that the Court already found that Cyber Mesa received a franchise with Santa Fe in 2018 (approximately four years after the service agreement). *See supra* Section I.A. This, again, suggests that the Contract is no longer operative.

Despite the evidence from the Contract itself, however, Santa Fe represents in its briefing that "there are holdover provisions," (Doc. 132) at 21, for "operation and maintenance of the City's fiber broadband project, for compensation," (Doc. 130) at 16. Added to the ledger on the side of uncertainty about the Contract is the parties' dispute about Cyber Mesa's franchise fee payments: Santa Fe supports its contention that Cyber Mesa's contract is terminated by claiming that Cyber Mesa is already paying annual franchise fees ($2,278.43 in 2020), (Doc. 130) at 3, ¶ 7 (citing *id.* Ex. 5), but CNSP disputes that fact, asserting that the franchise fees are only for

telephone services, and not for internet services.  CNSP's counterargument relies entirely on the name of a document attached to an email, "Telephone Franchise Fees.pdf."  (Doc. 133) at 1–2 (citing (Doc. 129) Ex. 5).  Santa Fe, in turn, argues that collected fees are for all "telecommunications service" generally, and not just telephone services, (Doc. 135) at 2, but Santa Fe does not allege affirmatively what portion of Cyber Mesa's fee payments, if any, are collected for fiber internet service.  This makes it difficult to ascertain whether Cyber Mesa still operates under the 2014 Contract or if it pays fees according to its 2018 Franchise Agreement.

The Court, deprived of undisputed facts, cannot discern from the exhibits and arguments whether the Contract is still operative, and if so, what unique benefits accrue to Cyber Mesa. Given this tangled web of contested facts, the Court can at least draw one conclusion: CNSP, which carries the burden of proof at trial, has not shouldered its evidentiary burden here to affirmatively prove the absence of a genuine issue of material fact.  *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).  The Court is not persuaded that no reasonable jury could find for Santa Fe.  Accordingly, the Court must deny CNSP's Motion for Summary Judgment on Cause of Action 2.  (Doc. 131).

This conclusion, however, does not resolve Santa Fe's Motion for Summary Judgment, which requires the Court to consider the legal merits of the claims and defenses.

ii.  *Substantial Legal Deficiencies In The Claim Justify Summary Judgment for Santa Fe*

Even if the Court resolved all disputed facts in CNSP's favor, Santa Fe raises sufficient dispositive legal issues related to essential elements of CNSP's claims that the Court concludes summary judgment in the City's favor is appropriate.  *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013).  The Court is persuaded that CNSP could not, as a

matter of law, prove that Cyber Mesa is currently advantaged to an extent amounting to a prohibition on CNSP or other newer market entrants.

In the FCC opinions debated by the parties, there are two ways to arrive at a prohibition by unfair competitive advantage: first, by universal subsidization of incumbent providers facing new competition, and second, by absolute exclusion from the right-of-way or infrastructure facilities. The first way arose in the aftermath of the passage of the 1996 Telecommunications Act, which heralded a dramatic shift from phone service by government-sponsored monopolies to service provision in a competitive market.

In the first case cited by the parties, the FCC opined that state funding schemes which advantaged incumbents by monetarily subsidizing any loss in revenue from new intrastate rate reforms were impermissibly anti-competitive. *In Re W. Wireless Corp.*, 15 F.C.C. Rcd. 16227 (F.C.C. 2000). Importantly, the Court notes the FCC order is a non-binding advisory opinion.[7] CNSP cites to this case for the proposition that "a benefit to one provider may well constitute a barrier to other providers." (Doc. 131) at 12. The Court does not read the rule of the case so broadly. The FCC opined in opposition to universal direct-subsidy programs for incumbent providers. Santa Fe's service contract with Cyber Mesa, involving consideration for the construction and maintenance of fiber line, does not particularly resemble the state-wide protectionist subsidy scheme which Kansas attempted to implement. The Court therefore

---

[7] Kansas had changed its law before the FCC ruled. Thus, the FCC found the issue moot before opining on the law as it existed previously. *In Re W. Wireless Corp.*, 15 F.C.C. Rcd. 16227 (F.C.C. 2000).

declines to analogize the Cyber Mesa contract to the FCC Advisory Opinion skeptical of state schemes protecting monopoly telephone service providers.[8]

More applicable here is the second category of preempted local rules. In this case, preemption for unfair advantage is arrived at because of exclusive control of the right of way. In *Minnesota*, the FCC addressed a contract between the state and a provider which, in return for building 1900 miles of fiber optic wireline, granted the company exclusive physical access to all longitudinal rights of way along Minnesota's interstate freeways for at least 10 years. *In the Matter of the Petition of the State of Minnesota for A Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transp. Capacity in State Freeway Rts.-of-Way*, 14 F.C.C. R. 21697 (1999). An initial important proposition from this case is that an individual service contract can be more than a mere procurement contract and can fall within the scope of § 253 when it creates legal obligations affecting access to public rights of way. *Id.* at 21705–21708. The second important proposition is that exclusive control of and absolute exclusion of others from the right of way *can* constitute an unfair and preemptable competitive advantage. *Id.* at 21700 ("Indeed, the State's action, effectively granting an exclusive license to Developer, appears fundamentally inconsistent with the primary goal of the

---

[8] The Parties did not cite to what seems to be the most relevant controlling authority, *RT Commc'ns, Inc. v. F.C.C.*, 201 F.3d 1264, 1269 (10th Cir. 2000). There, the 10th Circuit preempted a Wyoming statute which absolutely prohibited competitors from entering the telephone market for 10 years so that incumbent providers could recoup their investment in new rural infrastructure first. *Id.* at 1269 (upholding FCC Order which found Wyoming statute preempted because its requirements "award certain incumbent [companies] the ultimate competitive advantage—preservation of monopoly status—and simultaneously saddle potential new entrants with the ultimate competitive disadvantage—an insurmountable barrier to entry."). This case is also easily distinguished because CNSP is not outright prohibited from providing services nor is Cyber Mesa granted a monopoly on internet services. And second, Cyber Mesa is not the incumbent in New Mexico—that is CenturyLink (formerly Qwest). Cyber Mesa is itself a competitive new entrant.

Telecommunications Act of 1996, to replace exclusivity with competition."); *also, id.* at 21708 ("Minnesota fails to show that the Agreement does not have the potential to violate section 253(a).  In particular, we are concerned that the Agreement has the potential to deprive competitors of the ability to compete on a facilities basis.").  That said, the FCC only found that the contract *could* be prohibitive in principle.

In fact, the FCC declined to preempt the *Minnesota* contract because it concluded that right-of-way exclusions are not *per se* prohibitory and insufficient evidence supported preemption.  *Id.* at 21700.  The FCC reasoned that it is possible to ameliorate facilities exclusions if there are other ways for new entrants to provide services.  *Id.* at 21709 ("The evidence in the present record precludes us from concluding that the Agreement will not have the effect of prohibiting facilities-based competition because of the availability of alternative rights-of-way, the existence of excess fiber optic capacity, or access to Developer's capacity.").

Here, another important distinction frustrates application of the FCC Opinion to this case. Even if it is true that Cyber Mesa has exclusive access to one particular line, CNSP has not presented facts showing it is entirely excluded from providing services, nor that exclusion from a single line could not be ameliorated either through alternate routes, through constructing its own fiber line, through co-location, or through purchasing access to existing line.  In fact, CNSP acknowledges that it could connect to existing fiber line by building more line to "the closest point of interconnection," that it could "build and maintain duplicate underground facilities," or that it could "lease use of the fiber line from Cyber Mesa." (Doc. 131) at 13.  The Court is sympathetic that those options could be costly for CNSP, but CNSP points to, and the Court is aware of, no authority which entitles providers to cost-free market entry. *C.f.*, *Qwest Corp. v. City of Santa Fe, New Mexico*, 224 F. Supp. 2d 1305, 1317 (D.N.M. 2002), aff'd in part,

remanded in part, 380 F.3d 1258 (10th Cir. 2004) (The materially inhibits standard is not "so broad as to preempt any and all local action," and instead "speaks in terms of prohibition, not in terms of minor delays, increased costs, and occasional inconvenience." (cleaned up) (internal citations omitted)).

For these reasons, the Court concludes that CNSP has raised insufficient facts to show that an improper and preemptable competitive advantage has been bestowed upon Cyber Mesa or that an absolute prohibition or exclusion currently restricts CNSP—even if the Cyber Mesa contract is indeed still operative and all disputes are resolved in CNSP's favor.  And given that the Court already found that Cyber Mesa received a franchise with Santa Fe on the same day as CNSP and that the two franchise agreements are identical, *supra* Section I.A, the Court is persuaded there are no further facts CNSP could present which would show Cyber Mesa enjoys an absolute competitive advantage prohibiting CNSP from providing internet services.  Accordingly, the Court grants Santa Fe's Motion for Summary Judgment, (Doc. 130), as it relates to Count 2.

III.  *Conclusion*

Because the Court concludes, as a matter of law, that Santa Fe's 2 percent fee is not *per se* prohibitory nor that it materially inhibits provision of internet service, it denies CNSP's Motion for Summary Judgment for Cause of Action 1, (Doc. 129), and grants Santa Fe's Motion for Summary Judgment, (Doc. 130), as it relates to Count 1.  On Count 2, the Court concludes that, resolving disputed facts in CNSP's favor, no reasonable fact finder could find that CNSP suffers a preemptable unfair competitive disadvantage.  Accordingly, the Court denies CNSP's Motion for Summary Judgment on Cause of Action 2, (Doc. 131), and grants Santa Fe's Motion, (Doc. 130), as it relates to Count 2.

These rulings address all outstanding claims.  The Court will, therefore, separately enter final judgment in favor of Santa Fe.

IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE